IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No. 12-cv-00484-RBJ

SHARON L. BLOTCHER,

    Plaintiff,

v.

SHELBY R. STEWART and
MERCHANTS MOVING & STORAGE, INC. a North Carolina corporation,

    Defendants.

# ORDER

    The case is before the Court on defendants' motion to exclude certain expert testimony of S. Gregory Hipskind, M.D. and Dennis A. Helffenstein, Psy.D. The motion is granted in part and denied in part.

## FACTUAL BACKGROUND

    Sharon Blotcher was injured on March 25, 2009 when her car was rear-ended by a Merchants Moving & Storage truck driven by Shelby Stewart. She claims to have sustained a mild traumatic brain injury as a result. Defendants are skeptical that the accident caused significant injuries for various reasons, including that Ms. Blotcher did not immediately seek medical attention, and that she was involved in what defendants describe as an "arguably more severe accident" approximately 14 months later. Defendants are also skeptical of some of the expert medical testimony that Ms. Blotcher plans to present at trial, which is the genesis of the pending motion.

Ms. Blotcher claims that the accident left her dazed and confused. She began to experience headaches, neck and shoulder pain the next day and initially saw a chiropractor. Ms. Blotcher saw her primary care physician on March 30, April 13, and April 27, 2009, and on the third visit she reported feeling dizzy and spacey. Her doctor felt (as did her chiropractor) that she could have a mild traumatic brain injury or concussive syndrome and recommended a neuropsychological evaluation.

A neuropsychologist, Dr. Helffenstein, first saw Ms. Blotcher in June 2009. The record before me does not include his initial report of June 19, 2009, but apparently his assessment was that Ms. Blotcher met the diagnostic criteria for a mild traumatic brain injury or post-concussive syndrome. Ms. Blotcher also saw, among other health care professionals, Jonathan H. Woodcock, M.D., a neurologist, although I am not aware of the date of his examination. He apparently concluded that she had sustained a concussion in the subject accident and suffered from persistent cognitive impairment, disequilibrium, and posttraumatic visual impairment related to the concussion.

Two years after Ms. Blotcher first saw Dr. Helffenstein, i.e., in June 2011, she underwent a full battery of neuropsychological tests with him. I have not seen Dr. Helffenstein's report on this testing, dated November 3, 2011, but apparently in his opinion the tests disclosed cognitive deficits which he attributed to a mild traumatic brain injury resulting from the March 25, 2009 accident.

This case, asserting claims of negligence and negligence per se, was filed in this court pursuant to diversity of citizenship jurisdiction on February 24, 2012. It was originally scheduled for trial in July 2013, but the trial was continued to June 23, 2014 due to a medical issue involving plaintiff's counsel. On November 5, 2013 the parties engaged in unsuccessful

settlement mediation.  At some point, although I do not presently know whether it was before or after the mediation, Dr. Helffenstein suggested that a brain SPECT scan be performed.  Scans were performed on November 7 and 11, 2013 at CereScan, Inc., a brain imaging center, and the resulting images were interpreted by Dr. Hipskind.  In his opinion the images show areas of abnormal cortical and subcortical hypoperfusion (decreased blood flow through an organ) that are "most consistent with the scientific literature pertaining to traumatic brain injury." Brain SPECT and Assessment Report [ECF No. 35-1] at 3.

In their pending motion defendants ask the Court to exclude Dr. Hipskind's opinions and testimony, his SPECT scan, and a related portion of Dr. Helffenstein's opinions and testimony.  The Court conducted a "*Daubert* hearing" on May 22 and 28, 2014.  In addition to the testimony of Dr. Hipskind, the Court received testimony from two physicians retained by the defendants, Stephen A. Moe, M.D. and Hal Wortzel, M.D. (and, of course, a multitude of exhibits).[1]

## FINDINGS AND CONCLUSIONS

**I.     TIMELINESS OF DISCLOSURES.**

Preliminarily, defendants argue that a supplemental report of Dr. Helffenstein dated December 17, 2013 should be precluded as untimely.  As indicted above, Dr. Helffenstein has been involved in Ms. Blotcher's treatment since 2009.  His opinions were timely disclosed prior to the original July 29, 2013 trial date.  On November 8, 2013, following the failed mediation, plaintiff filed a motion for leave to supplement her expert disclosures no later than November 13, 2013.  [ECF No. 33].  In the motion plaintiff informed the Court of Dr. Helffenstein's request for

---

[1] Following the hearing the parties filed supplemental exhibits in support of their respective positions, without leave of the Court.  [ECF Nos. 58 and 59].  The Court declines to consider these materials and issues this ruling on the basis of the briefs, evidence and argument received through the conclusion of the hearing.

3

a brain SPECT scan and counsel's expectation that Dr. Hipskind's report on the scan results would be completed by November 13, 2013. The Court granted the motion. [ECF No. 34].

The Hipskind report was generated on November 12, 2013. Plaintiff supplemented her expert disclosures on November 13, 2013 to include Dr. Hipskind's report and images and to notify opposing counsel that Dr. Helffenstein would testify that the SPECT scan results correlate with the results of his neuropsychological testing. Dr. Helffenstein prepared a supplemental report dated December 17, 2013 that took into account the Hipskind report. The supplemental report was produced to the defendants on January 2, 2014.

This dispute might have been avoided if plaintiff had requested leave to file Dr. Helffenstein's supplemental report out of time and had delivered the report to defense counsel more quickly after it was prepared. However, these are not major transgressions that would cause the Court to deny the jury access to the information. After all, the supplemental report has been in defendants' hands more than five months before the upcoming June 23, 2014 trial. The defendants have had ample time for additional investigation and discovery to the extent they wanted it. Defendants have their own experts who, among other things, attended the Daubert hearing and who both observed Dr. Hipskind's testimony and testified in opposition to it. The Court finds that the defendants have not suffered any undue prejudice (nor do they so claim), and that plaintiff's short delay in producing the supplemental report does not appear to have been intended to keep the defendants in the dark. Accordingly, the request to exclude the supplemental report and opinions on the basis of untimely disclosure is denied.

## II.   ADMISSIBILITY OF THE BRAIN SPECT SCAN EVIDENCE.

Under Rule 702 of the Federal Rules of Evidence, a qualified expert may provide opinion testimony if his specialized knowledge would assist the jury in doing its job (factfinding), and

the opinions are based on sufficient facts and reliable methods properly applied to the facts. Put another way, the evidence must be both relevant and reliable. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993). Expert opinions are **relevant** if they would "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702; *see also Daubert*, 509 U.S. at 591. They are **reliable** if, in addition to the expert's being qualified, his opinions are "scientifically valid" and based on "reasoning or methodology [that] properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 593.

The proponent of expert testimony has the burden to show that the testimony is admissible. *U.S. v. Nacchio*, 555 F. 3d 1234, 1241 (10th Cir. 2009). The trial court plays a "gatekeeping" role that involves an assessment of the "reasoning and methodology underlying the expert's opinion" and a determination of "whether it is scientifically valid and applicable to a particular set of facts." *Goebel v. Denver and Rio Grande Western R.R. Co.*, 215 F.3d 1083, 1087 (10th Cir. 2000). However, the trial court has discretion as to how to perform this gatekeeping function. *Id.* It is not a role that emphasizes exclusion of expert testimony. Judge Kane aptly summarized the thrust of *Daubert* in interpreting and applying Rule 702:

> A key but sometimes forgotten principle of Rule 702 and *Daubert* is that Rule 702, both before and after *Daubert*, was intended to relax traditional barriers to admission of expert opinion testimony. Accordingly, courts are in agreement that Rule 702 mandates a liberal standard for the admissibility of expert testimony. As the Advisory Committee to the 2000 amendments to Rule 702 noted with apparent approval, "[a] review of the caselaw after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule.

*Cook v. Rockwell Intern. Corp.*, 580 F. Supp. 2d 1071, 1082 (D. Colo. 2006) (citations omitted).

With those broad principles in mind, I turn to the task of assessing the relevance, reliability, and, ultimately, the admissibility of the brain SPECT testimony.

### A. <u>Relevance</u>.

Single Photon Emission Computed Tomography ("SPECT") involves the injection of a tracer, which emits gamma rays, into the blood stream. The blood delivers the tracer to the area of interest. A gamma camera takes "pictures" from which the computer generates three-dimensional images or "slices" of the area. The images provide information regarding blood flow from which a person skilled in interpreting the images can determine whether an abnormality is present. This process is somewhat analogous to an x-ray except that an x-ray shows structures inside the body whereas a SPECT scan is intended to show how an organ is functioning. SPECT scans can also be compared to, and contrasted with, more familiar CT and MRI imaging. CT scans (using x-rays) and MRI scans (using magnetic fields) can look at the structure of the brain. The SPECT scan does not look at structures as such but instead, by measuring blood flow, looks at how various areas on the surface and even under the surface of the brain are functioning.

Defendants' only argument that I view as challenging the relevance of the brain SPECT scan testimony in this case is that it does not address whether the alleged abnormality in Ms. Blotcher's brain was caused by the subject accident or by her subsequent accident or by something else entirely. But that isn't the point of this evidence. Dr. Hipskind acknowledges that he has no opinion on causation. As discussed below, SPECT scan results, like x-rays, CT scans, and MRI scans, are provided to the clinician so that they can be considered, along with other available information, in the clinician's determination of a diagnosis of the injury and perhaps its cause. Lay jurors are dependent upon expert opinions in determining whether someone has sustained a traumatic brain injury, and therefore, the evidence would at least

indirectly be helpful to them as well.  The undisputed fact that brain SPECT scan evidence does not address causation goes to its weight (and can be emphasized on cross-examination), not to its admissibility.

### B. Reliability.

In *Daubert* the Supreme Court provided a non-exclusive list of factors that trial courts can consider in determining the reliability of expert opinion testimony, including whether the theory or technique (1) can be and has been tested; (2) has been subjected to peer review and publication; (3) has a known or potential rate of error; and/or (4) has widespread acceptance in the relevant scientific community.  509 U.S. at 593–94.  The Court emphasized that the inquiry is flexible, focusing on principles and methodology and not on the conclusions generated.  *Id.* at 594–95.[2]

To begin, I find—and this is not disputed—that Dr. Hipskind is qualified to interpret brain SPECT scan images.  As an M.D. he has specialties in neurology and family medicine.  He also has a Ph.D. in Neurophysiology (the study of the human nervous system).  He developed an interest in brain SPECT scans.  In 2002, after interpreting some 600 scans, he was licensed to perform them.  He has attended additional courses and obtained various certifications since that time including certification as a Brain Injury Specialist by the American Brain Injury Association and certification in Nuclear Competency by the Institute for Nuclear Medicine Education.  His practice has been exclusively dedicated to brain imaging since 2003 except

---

[2] Other similar lists of potentially relevant factors have also been generated. *See, e.g.*, *United States v. Downing*, 753 F.2d 1224, 1238–39 (3d Cir. 1985) (the novelty of the new technique, the existence of specialized literature, the qualifications and professional stature of the expert, whether it has non-judicial uses, the frequency to which it leads to erroneous results, and whether expert testimony has been offered in earlier cases either to support or dispute the merits of the technique). Importantly, however, the trial court "need not 'recite the *Daubert* standard as though it were some magical incantation.'" *Goebel*, 215 F.3d at 1088 (quoting *Ancho v. Penkek Corp.*, 157 F.3d 512, 518 (7th Cir. 1998)). Rather, it must make specific findings that adequately show that it has performed its gatekeeping function. *Id.*

during a period of time (2010 to 2013) when, due to a family medical problem, he temporarily returned to his family home and worked in a rural health clinic. According to his affidavit he has studied and reviewed more than 4,000 brain SPECT scans. [ECF No. 44-2 at 2]. He has written and taught extensively in the field of brain SPECT imaging. Finally, he has been qualified as an expert numerous times in both federal and state courts.

Turning to the science, Dr. Hipskind testified that SPECT imaging is more than 50 years old. In the early years it was used (and is still used) for heart scans and scans of other parts of the body, such as lungs and bones. The first brain SPECT scans were performed some 20 to 25 years ago, but it became more commonly used for that purpose in the late 1980's and early 1990's. The American College of Radiology, the Society of Nuclear Medicine, and the European Association of Nuclear Medicine have all issued guidelines for the use of SPECT imaging in brain scans. Hearing Exhibits 3–5.

Dr. Hipskind testified that the technique has been endorsed in the relevant medical communities (the general radiological and nuclear medicine communities) primarily for evaluation of dementia, evaluation of cerebral vascular disease and stroke, pre-surgical seizure localization, and evaluation of traumatic brain injury. It has also been approved for evaluation of brain death and encephalitis. It is currently being investigated for possible use in the evaluation of neuropsychiatric disorders such as ADHD, bipolar disorder, anxiety disorders, and obsessive/compulsive disorders, but that use has not yet been approved or endorsed by any professional organization.

I note that the experts retained by the defendants, Dr. Moe and Dr. Wortzel, do not dispute the scientific validity of SPECT as a technique. They do not dispute that it has been subjected to adequate scientific review and testing or that it has been the subject of appropriate

peer reviewed articles. Brain SPECT scans plainly have non-judicial uses. Even Dr. Hipskind, who frequently testifies in depositions and trials, indicated that only a very small percentage of the SPECT scans he has performed for patients suspected of having traumatic brain injuries (he estimates approximately 100 of some 2000 patients) have resulted in testimony.

In addition, I note that Dr. Hipskind's opinions have been the subject of *Daubert*-type challenges on several previous occasions. In a relatively early case, *Searcy v. Hamburger*, No. 02CV2260-ZLW-MJW (D. Colo. June 3, 2005), the court found that the technique could be and had been tested; that it had been subjected to peer review; and that while relevant publications, scientists and doctors were still divided, its use was supported by two respected organizations, the American College of Radiology and the Society of Nuclear Medicine. Transcript of Bench Ruling [ECF No. 44-8 in present case] at 3–5. Borrowing a phrase from *Daubert*, the court held that Dr. Hipskind's opinions were "shaky but admissible." *Id.* at 5.

Seven years later Dr. Hipskind's use of brain SPECT imaging in a traumatic brain injury case was again examined by a federal court. *Todd v. Baker*, No. CV 10-127-M-DWM, 2012 WL 1999629 (D. Mont. June 4, 2012). As in the present case Dr. Hipskind, using the SPECT images and a brief patient history, opined that the scans were "most consistent with a traumatic brain injury." *Id.* at *4. The court noted that SPECT scans appear least reliable when a head injury is mild. *Id.* at *5. That is how Ms. Blotcher's injury is characterized in the present case. But the court also noted that the American Academy of Neurology and the Society of Nuclear Medicine consider SPECT imaging an investigational tool for the study of mild head injury, albeit not a diagnostic or evaluative tool for the treatment of patients. *Id.* Like Judge Weinshienk, the court described the evidence as "shaky but admissible" and indicated that its weight could be explored on cross-examination. *Id.* at *2.

In *Nelson v. United States*, No. 11CV2953-WYD-MEH, 2014 WL 1929585 (D. Colo. May 14, 2014) Dr. Hipskind's SPECT scan testimony was described as "credible," not based on a *Daubert* hearing but based on the court's observations during the damages phase of a trial in a case involving a severe traumatic brain injury. *Id.* at *2.

Plaintiff also has provided copies of unpublished orders from several state trial courts in Colorado which have denied challenges to Dr. Hipskind's brain SPECT scan testimony under C.R.E. 702 and under Colorado's *Daubert* counterpart, *People v. Shreck*, 22 P.3d 68 (Colo. 2001). [ECF Nos. 44-10 through 44-12]. Plaintiff has also supplied copies of unpublished Colorado state court orders apparently denying challenges to brain SPECT testimony from other experts. [ECF Nos. 44-13 and 44-14]. Defendants have cited no case, nor have I found one, where such testimony was excluded.

One might wonder, therefore, whether the pending motion is "déjà vu all over again," just another in the long line of unsuccessful *Daubert* challenges to Dr. Hipskind's testimony. But the challenge to one aspect of his opinion struck a responsive chord with me. Dr. Hipskind testified that no imaging technique, including brain SPECT imaging, can provide a definitive diagnosis of traumatic brain injury. He repeatedly emphasized that he cannot provide a diagnosis. Plaintiff's counsel similarly argued that Dr. Hipskind will not provide a diagnosis, and that the brain SPECT images and Dr. Hipskind's interpretation of them are nothing more than a piece of information to be taken into account by the clinician in diagnosing Ms. Blotcher's condition. But notwithstanding those disclaimers, I find that Dr. Hipskind <u>is</u>, in substance, providing a diagnosis, albeit one that is somewhat disguised by the language of his report.

The critical language of Dr. Hipskind's report is found in two sentences: "The nature, location and pattern of these abnormalities is *most* consistent with the scientific literature

pertaining to traumatic brain injury. Close correlation with clinical condition is advised." [ECF No. 35-1 at 4] (emphasis added). To say that the abnormalities are "most consistent" with the literature pertaining to traumatic brain injury is, in substance, to say that the abnormalities probably result from a traumatic brain injury. No matter how carefully phrased, that is a diagnosis.

The problem is that, as Dr. Hipskind himself acknowledges and as the plaintiff emphasizes in her response to the pending motion [ECF No. 44 at 19–23], brain SPECT imaging is not recognized or accepted in the relevant scientific communities as a diagnostic technique. Thus, the Society of Nuclear Medicine Guidelines, emphasized by the plaintiff and submitted both as Exhibit 5 to her response and as hearing exhibit 4, state that "[c]are must be taken to avoid implying the existence of cause and effect relationships between scan and behavioral/neurologic abnormalities." [ECF No. 44-5 at 5, document p. 117]. The Guidelines also state that each "clinical report" should provide a full differential diagnosis, and that the interpretation of the scan should be qualified, as appropriate, by the patient's known clinical history, associated co-morbid conditions, medications, and other diagnostic studies such as CT, MRI, and EEG. *Id.* To the extent that Dr. Hipskind's report could be classified as a clinical report—and it is that to the extent it provides a diagnosis—then to be compliant with the Guidelines, it would need to provide qualifications and a differential diagnosis that it lacks.

Somewhat similarly, the American College of Radiology Guidelines state that "[r]elevant patient data should be obtained for optimal interpretation of the study." [ECF No. 44-4 at 2]. Dr. Hipskind acknowledges that he obtained minimal patient data. He emphasizes that he prefers to conduct "blind" studies where he interprets what the images tell him without advance knowledge of the patient's history. That makes good sense. By the same token, however,

11

without knowledge of the patient's history and other potential causes or contributing causes of abnormalities observed on the images, the scan becomes what science says it should not be, a standalone diagnostic tool.

Contrary to defendants' urging, the solution is not that the Court throw out the baby with the bathwater. As I have said, Dr. Hipskind is well qualified to interpret brain SPECT scans. Brain SPECT imaging has been tested, reviewed, and determined to be scientifically valid. It has value if used as intended, i.e., used as the clinician deems appropriate together with other patient information to form a differential and ultimately a final diagnosis of the patient's condition. I find and conclude that if Dr. Hipskind testifies about brain SPECT imaging in general, the testing that was performed on Ms. Blotcher, the resulting images, his opinion that the images reveal areas of hypoperfusion and thereby abnormalities, and, importantly, that the abnormalities are "consistent with" (as opposed to "most consistent with") a traumatic brain injury, his testimony would meet all requirements for admissibility under Rule 702.

The difference between "consistent with" and "most consistent with" might be a subtle one, but it is for a qualified clinician and not Dr. Hipskind to provide an opinion on whether Ms. Blotcher more likely than not sustained a traumatic brain injury. At that point, other alleged shortcomings of Dr. Hipskind's opinions (for example, that not all scientists and doctors view SPECT imaging as valuable even today, that Dr. Hipskind did not know or consider alternative explanations of the abnormalities, that the images were obtained some four and a half years after the subject accident, that even if she has sustained a mild traumatic brain injury it might have been caused by the second accident, etc.) can be explored on cross-examination and through the testimony of the defendants' experts, going to the weight and not the admissibility of the evidence.

I will comment briefly on two additional criticisms that defendants have singled out. Dr. Hipskind compares his patients' images to those obtained from a "normative" control group. Defendants suggest that the control group he uses is too small to provide a reliable baseline comparison. The control group consists of 64 individuals of whom 24 are in Ms. Blotcher's age group. It was assembled by Dr. Ismael Mena of UCLA who screened potential subjects over a seven year period to eliminate known causes of blood flow abnormalities such as trauma, mental illness, substance abuse, and infection. Dr. Hipskind describes Dr. Mena as "one of the world's most renowned brain imagers." Affidavit [ECF No. 44-2] at 2. The same control group is also used by other brain SPECT scan experts. In *Todd* the court noted that while a larger control group might be helpful and make comparison results less vulnerable to a challenge, studies based on the database have been subjected to peer review. 2012 WL 1999629 at *4. The court indicated that the defendant did not show that the database resulted in an inaccurate comparison. *Id.* The same is true here. Defendants can use cross-examination and their own experts to challenge the control group or the comparison, but again that goes to the weight, not to the admissibility, of the evidence.

Defendants also suggest that that plaintiff has not shown that brain SPECT imaging has a known or potential rate of error. Actually, Dr. Hipskind estimated an error rate in the range of 5 to 12% based at least in part on studies conducted by Dr. Axel Jacobs and Dr. Oren Vader. Plaintiff suggests that the "sensitivity" of SPECT imaging (its ability to detect a condition that the patient is known to have) and the "specificity" of the test (its ability to produce a negative result when the patient is known not to have the condition) are strongly supportive. The high sensitivity of SPECT imaging is supported by a study headed by a radiologist at Columbia University. Hearing Exhibit 26, Van Heertum, et al., "Single Photon Emission CT and Positron

Emission Tomography in the Evaluation of Neurologic Disease," Vol. 39, No. 5, Radiologic Clinics of North America (September 2001). Defendants' experts do not dispute that SPECT has high sensitivity. The specificity numbers for SPECT imaging are apparently not quite as good as the sensitivity numbers. *See, e.g.*, Hearing Exhibit 20 (a chart purporting to summarize SPECT's sensitivity and specificity in mild traumatic brain injury cases). Whether the somewhat decreased specificity of SPECT imaging diminishes its value, however, is another example of a potential criticism that goes to weight rather than admissibility. It can be explored on cross-examination and by defendants' experts.

In sum, I find from the evidence presented, both as exhibits to plaintiff's response and from the testimony and exhibits admitted during the *Daubert* hearing, that (1) Dr. Hipskind is qualified by education, training, and experience to render opinions regarding brain SPECT imaging, including his interpretation of the scans of Ms. Blotcher's brain; (2) his opinions are based on sufficient data; (3) brain SPECT imaging has been shown to be a sufficiently reliable methodology of detecting abnormalities in cases of suspected traumatic brain injury; (4) so long as Dr. Hipskind limits his testimony to an opinion that Mr. Blotcher's images are "consistent with" a traumatic brain injury and he does not attempt, expressly or impliedly, to provide a diagnosis that she probably sustained a traumatic brain injury, he will have reliably applied the methodology to the facts of this case; and (5) the opinions would be of assistance to the jury in determining whether there are abnormalities in Ms. Blotcher's brain and in evaluating the opinions of the clinical witnesses who will testify to their diagnosis of Ms. Blotcher's injuries.

## III.     DR. HELFFENSTEIN'S CAUSATION OPINION.

Finally, defendants argue that Dr. Helffenstein, the neuropsychologist, should not be permitted to render an opinion on causation, i.e., whether the March 25, 2009 accident was the

cause of Ms. Blotcher's alleged mild traumatic brain injury. Motion [ECF No. 35] at 12–13. They argue that (1) an expert cannot opine on an issue of law, and (2) Dr. Helffenstein is not an expert in the field of biomechanics. *Id.*

Certainly Dr. Helffenstein cannot provide an opinion on the law. Whether a neuropsychologist may opine on the physical cause of an organic brain injury depends on the plaintiff's ability to provide a proper foundation for such testimony. *See, e.g.*, *Huntoon v. TCI Cablevision of Colorado, Inc.*, 969 P.2d 681, 690 (Colo. 1998). But I do not reach that issue today, both because there is insufficient evidence in the record to resolve it, and because, in response to a question from the Court during the *Daubert* hearing, defense counsel clarified that defendants' present challenge goes only to Dr. Helffenstein's supplemental report of December 17, 2013, and specifically to his reference to the SPECT results, not to his opinions that were previously formed and disclosed. Therefore, whether a sufficient foundation can be laid at trial to warrant Dr. Helffenstein's expression of an opinion linking the March 25, 2009 accident to specific injuries remains to be seen.

Dr. Helffenstein's supplemental report quotes the "most consistent with" opinion expressed in the Hipskind report. Just as I have limited Dr. Hipskind's testimony so as to eliminate the word "most" (and to preclude Dr. Hipskind from providing, expressly or impliedly, a diagnosis of mild traumatic brain injury based on the SPECT images) I direct plaintiff to avoid providing the same information to the jury indirectly through Dr. Helffenstein by his quoting the words used in the Hipskind report or by attributing a diagnosis to Dr. Hipskind. Dr. Helffenstein should be carefully prepared so as to avoid an inadvertent violation of that direction.

The primary substance of the supplemental report, however, is not necessarily problematic. After noting that he had reviewed Dr. Hipskind's report, Dr. Helffenstein states:

> As you are aware, Ms. Blotcher underwent Neuropsychological Evaluation with me in June of 2011. Her neuropsychological testing identified neuropsychological deficits, inconsistencies, or relative weaknesses most indicative of bilateral temporal dysfunction. There was some less significant suggestion of frontal involvement as well. Therefore, there is a high degree of correlation between Ms. Blotcher's neuropsychological test results and her brain SPECT imaging at CereScan. Her brain SPECT study provides strong corroborating evidence to support my diagnosis of a Mild Traumatic Brain Injury in this case.

[ECF No. 35-5 at 5].

I do not know at this point how much patient history Dr. Helffenstein had when he formed his diagnosis, nor do I know to what extent factors in addition to the neurological test battery contributed to the formation of his original opinions. I will assume for now that Dr. Helffenstein's original diagnosis of a mild traumatic brain injury rests on an adequate foundation, and that a sufficient foundation for Dr. Helffenstein's ability to interpret the images provided by Dr. Hipskind and to form an opinion as to whether they tend to corroborate his diagnosis can be provided. If so, then the opinion quoted above would be admissible.

## ORDER

The defendants' motion to preclude expert testimony [ECF No. 35] is granted to the extent that Dr. Hipskind may not express or imply that the brain SPECT images provide a probable diagnosis of mild traumatic brain injury, including his wording that the images are "most consistent with" such a diagnosis. In all other respects the motion is denied.

DATED this 30th day of May, 2014.

BY THE COURT:

_____
R. Brooke Jackson
United States District Judge